# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

**FILED**
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By cramirez at 3:50 pm, Jan 20, 2011

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | Adversary Proceeding |
| CLEVELAND GROVER ZIPPERER III | ) | |
| (Chapter 7 Case Number <u>09-41690</u>) | ) | Number <u>09-4071</u> |
| | ) | |
| *Debtor* | ) | |
| | ) | |
| | ) | |
| | ) | |
| MICHAEL PORTMAN | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLEVELAND ZIPPERER III | ) | |
| | ) | |
| *Defendant* | ) | |

## MEMORANDUM AND ORDER

Debtor's case was filed on August 4, 2009. On November 9, 2009, Michael

Portman ("Portman") filed a complaint seeking a determination that a debt owed to him by

Debtor should be held non-dischargeable. After discovery and pre-trial proceedings, the

issue was tried on December 7, 2010. Based on the evidence and applicable authorities I

make the following Findings of Fact and Conclusions of Law.

%AO 72A
(Rev. 8/82)

## FINDINGS OF FACT

Debtor is in his early forties and has operated a very successful landscape business in the Savannah area for a number of years. Through that relationship he became acquainted with Portman. Debtor worked for Portman for several years, billing and receiving payment for more than $300,000.00 worth of landscape work. By all accounts Debtor's work is of excellent quality, is innovative, and is highly sought after. However, as a result of business reversals brought on by the economic recession, Debtor's business dropped off dramatically and he filed personal bankruptcy.

The obligation at the heart of this controversy arose because of a 2004 business arrangement between Debtor and Portman. In addition to his landscape work, Debtor had invested in real estate and had successfully engaged in some purchase/renovation/sale transactions in residential real estate, sometimes referred to as "flip" transactions. He discovered a residence on a very desirable part of St. Simons Island (the "House") which he believed—after some renovation work—could sell for $500,000.00 or more, but could be purchased for $330,000.00. He asked his then-wife (from whom he is now divorced) if she would advance the money to make the down payment for that purchase. When she declined, Debtor approached Portman (with whom he had a long-established business relationship) about advancing the down payment. Portman agreed to lend the money with the understanding that Debtor would perform the renovations, place the house on the market, and sell it, hopefully within a six month period. It was always

Portman's understanding that the purpose of the transaction was to acquire, renovate, and flip the house within a six to twelve month period. Portman did not intend that the House was to be used as a vacation home or office location for Debtor, his family, or his business.

Out of an abundance of caution, Portman's counsel drafted a promissory note payable in twelve months, in the event the sale was not accomplished on as timely a basis as anticipated. Debtor executed that note on September 30, 2004, witnessed by Portman's attorney. The note was in the principal amount of $37,000.00, provided for interest at the rate of 8.5% per annum, and was due October 1, 2005. It further provided that in addition to principal and interest, Debtor would pay Portman 25% of any profit obtained on the resale of the House as defined in the note. Exhibit P-3. Portman advanced those funds and they were taken to a closing with SunTrust Bank. SunTrust advanced to Debtor a loan in the principal amount of $287,200.00 on September 30, 2004. Exhibit P-1C. The numbers on the HUD-1 closing statement in the SunTrust transaction are not entirely understandable in that the HUD-1 shows that cash was required from Debtor/borrower in the amount of $76,904.79. Id. However, Debtor testified that the only thing he paid at closing were the closing costs of $8,922.75 and the $35,000.00 down payment (advanced by Portman). It is possible that some or all of the difference is reflected on line 112 "Construction Process" which was added to the gross amount due from the borrower in order to close. That number may have represented the anticipated renovation costs to the real estate funded by SunTrust in the related transaction. See Exhibit P-20. In fact, an additional

security deed was granted to SunTrust on December 20, 2004, in the amount of $35,000.00. Exhibit P-4. The construction loan agreement with SunTrust provided for a construction period ending on July 1, 2005. Construction Loan Agreement, Exhibit A, ¶ 7. It is impossible to tell if those proceeds were anticipated on the original closing HUD-1, line 112, but were not funded to the borrower until December. If that happened, it would explain why the cash due from the borrower at the closing was different from the amount Debtor testified he brought to the closing.

Debtor and his wife took possession of the House immediately after the closing with SunTrust. They began doing renovation, providing much of the labor themselves. Debtor also employed the services of his company and its employees to do work that required their manpower and expertise. In March of 2005 Debtor approached Portman, stating that he needed additional funds to complete the renovations. Portman advanced an additional $12,000.00. Exhibit P-6.

By late April or early May of 2005 Portman understood that the renovation was essentially finished. He made a trip to St. Simons Island, saw the house, and observed that it was in finished condition except that some minimal work was needed in the garage area. When Portman inspected the home in May of 2005 he thought it looked fantastic, did not know what the total renovation costs were, but was aware Debtor had used his own labor and his own crews to do much of the work. Portman has not returned to the House since that

time.

Debtor assured Portman that he intended to sell and was trying to sell the House, but there was no sale. After multiple calls and letters, and a process of slowly worsening communications between them, Portman hired an attorney who sent a demand letter for payment of the note in April of 2008. Exhibit P-16. Debtor asked for more time to repay the note. Plaintiff agreed to delay filing a lawsuit, but that agreement was given in exchange for Debtor's execution of a security deed to secure the balance of the two notes. The security deed was prepared by Portman's counsel, executed by Debtor on May 5, 2008, and filed of record. Exhibit D-17.

Unfortunately, it was not until 2008 that Portman discovered that in July of 2006, unbeknownst to Portman, Debtor had borrowed $125,000.00 from Darby Bank, paid off the SunTrust construction loan of $35,403.34, and presumably pocketed the net proceeds of $88,213.66.[1] Exhibit P-11C. To secure that loan Debtor granted a second deed to secure debt to Darby Bank in the House. As a result, when Debtor executed and delivered the 2008 debt deed, Portman, who was unaware of the Darby Bank transaction, was placed in the unenviable third lien position behind both SunTrust and Darby Bank. Portman ultimately filed suit in the State Court of Chatham County, Georgia, in March of 2009. Exhibit P-17. Debtor filed an answer to Portman's state court law suit, but later filed a Chapter 7

---

[1] Debtor was also responsible for paying "Settlement Charges to Borrower" in the amount of $1,383.00.

AO 72A
(Rev. 8/82)

bankruptcy, which brought the state court litigation to a halt. After the bankruptcy, SunTrust (the first lienholder) foreclosed on the House on January 5, 2010. That foreclosure extinguished the second lien position of Darby Bank and the third position lien of Portman, rendering the debt owed to him entirely unsecured.

Portman contends that the obligation owed to him is nondischargeable under § 523(a)(2)(A) as the result of misrepresentations by Debtor in borrowing money under a commitment that the House would be renovated and sold within a short period of time when, in fact, Debtor had no intention of doing so.

Debtor vigorously disputes that Portman was unaware of the Darby Bank loan. Debtor further contends that he had revealed to Portman that it would take him much longer than six months to finish renovation and that he would use the House for occasional family use and as a Glynn County office location for his business. Debtor acknowledges that the plan was to renovate and flip the house but contends that there was no deadline and that his use of the House over the years was not a violation of their agreement.

While it appears from the documents that the estimated renovation cost was in the $29,000.00 to $35,000.00 range, Debtor now contends that the total cost of renovation was almost $145,000.00. *See* Exhibit D-7.

To reach a conclusion in this matter it is necessary to determine first whether Debtor violated the terms of the parties' contract—oral though it may have been. The first issue is whether Debtor breached the contract concerning the renovation process, the sales efforts required to sell it in a timely fashion, or the use of the House. The second issue is whether any breach arises to the level of false pretenses, false representations, or actual fraud within the meaning of § 523(a)(2)(A).

Because the testimony of Portman and Debtor are so completely at odds with one another on a number of points, it is helpful that there is testimony from independent witnesses. There is also evidence contained in the documents provided to the Court which aids the Court in determining the terms of the contract. After a review of all available information, I conclude that the contract terms were those as understood by Portman, and that at the time Debtor made those representations to Portman, he had no intention of adhering to them. The evidence is also replete with independent evidence which demonstrates that Debtor's testimony is entitled to little credibility.

1)      Despite Debtor's protestations that his purpose was always to flip the house, and not to acquire a second home, documentation with SunTrust shows that the stated purpose of the loan was to obtain a second or vacation home, not investment property. Exhibit P-1D, p. 4.

2)   The anticipated completion date in the construction loan agreement was July 1, 2005. Exhibit P-1C.

3)   Debtor's Affidavit of Occupancy described the residence as a second home, not investment property. Exhibit P-1F.

4)   Debtor made no good faith effort to sell the House until he listed it in 2008. Although he placed a "For Sale By Owner" sign on the premises sporadically, he placed no newspaper or internet advertisements.

5)   Debtor directs the Court's attention to the hiring of an appraiser in 2006 as evidence that he was attempting to determine the fair market value for the purposes of sale. Despite the fact that he might have also used the appraisal for that purpose, it is clear that the timing of the appraisal coincided with that of the Darby Bank loan. I conclude that the appraisal was obtained for the purpose of Darby Bank supporting its $125,000.00 second mortgage loan.

6)   Debtor testified that he informed SunTrust that Portman would be a co-investor, but that debt was not listed on the loan application. Exhibit P-1A. The loan application also fails to list Portman as a co-borrower, despite direction that "[c]o-borrower information must be provided . . . when the income or assets of a person other than

the Borrower . . . will be used as a basis for loan qualification . . . ." Exhibit P-1A, p. 1. The loan application also fails to list the borrowed down payment as required under "VIII. Declarations." Id. at p. 3.

7)    Debtor provided false information on his personal financial statement. He did not list any debt to Portman, he showed false rental income on the St. Simons home of $12,000.00 per year, and he showed a cash surrender value of $245,000.00 for a life insurance policy which did not exist. Exhibit P-11A.

8)    Debtor's ex-wife, to whom he was married from 1997 to 2008, could hardly be considered a friendly witness in this case. However, her testimony was compelling and convincing in light of extrinsic evidence that supports it. She first learned about the house when Debtor asked her to make the down payment loan, which request she declined. At that time she testified, and I conclude, that Debtor's goal was to find a vacation home on St. Simons Island where he had seen a number of very attractive purchase opportunities. Although he recognized some long-term investment potential, he never suggested to her that this would be a flip transaction, as he represented to Portman. Beginning in October of 2004 she worked side-by-side with him on a number of the renovations. She testified that the construction was essentially finished by the summer of 2005, as evidenced by other testimony in the case. She testified that the home had high-end electronics and appliances throughout,

was filled with high-end furnishings, monogrammed linens, and a number of other similar features which were both expensive, and more likely to have been included in a project such as this by someone intended to remain an owner and not a short-term seller.

9)    Michael Marburger, who was Portman's counsel in preparing the promissory notes and the deed to secure debt, testified as to his role in the creation of those documents and their execution.    His testimony concerning Portman's contemporaneous statements about the purpose of the loan was entirely consistent with Portman's testimony at trial. Marburger witnessed the execution of the original promissory note (Exhibit P-3) in 2004, and although he prepared it, he was not present when the second promissory note (Exhibit P-6) was signed in 2005.  He also prepared the May 5, 2008, deed to secure debt.  Exhibit D-17.

10)    The final critical witness was Donald Thompson, a realtor who had the listing of the House when Debtor purchased it.  He met with Debtor in August of 2004, showed him the House, and the sale closed in September.  After the closing Thompson stayed in touch with Debtor because he understood that the House was going to be renovated and resold.  Thompson wished be retained as the listing realtor when the House was ready to be resold.  He knew that Debtor offered the House "For Sale By Owner" for a time, but does not know exactly when that occurred and cannot state with any

certainty when he saw for sale signs on the House.  Thompson testified that for a time in 2008, Debtor listed the House with a different realtor.

From all the evidence, I conclude that the contract between the parties contemplated a quick renovation and sale with active marketing of the House, that Debtor never intended to follow through on the contract, and that he did not follow through.

### CONCLUSIONS OF LAW

11 U.S.C. § 523(a)(2)(A) provides that:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

Portman alleges that Debtor obtained money from him by misrepresenting the purpose of the purchase of the House.

"The elements of a claim under § 523(a)(2)(A) are: (1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a

result of the false representation." *E.g.* In re Wood, 245 Fed. Appx. 916, 917-18 (11th Cir. 2007) (citing In re Bilzerian, 153 F.3d 1278, 1281 (11th Cir. 1998)).

False Representation

A false representation includes a misrepresentation of intent. A breach of a promise is not necessarily a false representation if intervening events cause the debtor to change his course of action; the debtor must have intended not to perform a the time the promise was made. In re Foster, 2010 WL 2025784, *2 (Bankr. N.D. Ga. 2010) (citing 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009)). In the instant case, Debtor approached Portman with the suggestion that they buy the House, renovate it, and sell it, all within a short period of time. Debtor never revealed his true intent to use the House for personal use as a home office for an extended period of time. However, contemporaneous with his representations to Portman, Debtor represented on his Occupancy Certification (Exhibit P-1D, dated September 9, 2004) and his Affidavit of Occupancy (Exhibit P-1F, dated September 30, 2004) that the House was a second home, not an investment property. I acknowledge that Debtor has alleged in his brief that he was told by the lender to indicate the House was a second home if he was not planning to rent the House. Brief, Dckt. No. 45, p. 2 (December 20, 2010). I nonetheless find that Debtor planned this to be a second home. Debtor indicated on his Affidavit of Occupancy[2] that the

---

[2]On the Affidavit of Occupancy, the Affiant acknowledges that making a false statement for the purpose of influencing an institution insured by the Federal Deposit Insurance Corporation may be fined up to $5,000.00 and/or imprisoned for up to two years. Exhibit P-1F.

House was *not* for "an investment to be *held or rented*." Exhibit P-1F (emphasis added). Accordingly, I find that Debtor falsely represented to Portman what his true intentions were.

Reliance on the Representation

Portman testified that he loaned the money to Debtor because the nature of the investment was a short term investment. I find that Portman relied on Debtor's false representation to that effect.

Reliance was Justified

Portman and Debtor had a long-standing business relationship. I find that Portman's reliance on Debtor's representation—that the House would be flipped—was justified.

Sustained a Loss

Portman's reliance on Debtor's representation directly led to his current situation. Debtor defaulted on the note, relegated Portman to third priority, and filed bankruptcy, all but ensuring Portman would receive payment for none of the debt owed to him. I find that Portman sustained a loss, and that such loss was directly and proximately caused by Debtor's misrepresentation.

## O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS

THE ORDER OF THIS COURT that the debt owed to Portman is therefore excepted from

discharge under § 523(a)(2)(A).

Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 20 day of January, 2011.

AO 72A
(Rev. 8/82)